## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **MARSHA VANHOOK,** | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civ. No. 19-14864** |
| | : | |
| **THE COOPER HEALTH SYSTEM,** | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **Diamond, J.** | **MEMORANDUM** | **May 28, 2021** |

Marsha VanHook alleges that her former employer Cooper Health System discriminated and retaliated against her because she took leave under the Family Medical Leave Act and because of disabilities suffered by both her and her son. Cooper urges that it fired VanHook after video footage and photographs confirmed that she had repeatedly lied about the reasons she took leave. In responding, VanHook largely ignores this damning evidence, and instead conjures factual disputes respecting Cooper's decision (before it took any punitive action) to investigate her inordinate use of leave. Her arguments are well beside the point. Because the record confirms VanHook's abusive and dishonest actions, I will grant Cooper's Summary Judgment Motion.

## I.    JURISDICTION

The Court has jurisdiction to hear VanHook's FMLA and Americans with Disabilities Act claims under 28 U.S.C. § 1331 because they "aris[e] under" the laws of the United States. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

On May 15, 2020, Chief Judge Smith designated and assigned me to hear this case in the District of New Jersey pursuant to 28 U.S.C. § 292(b). (See Doc. No. 17.)

## II.    SUMMARY JUDGMENT

I may grant a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56. The movant must show that no genuine issue of material fact exists, even where the nonmovant would bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A dispute is "genuine" if a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. I must view all facts in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. Prowel v. Wise Business Forms, Inc., 579 F.3d 285, 286 (3d Cir. 2009).

## III.    BACKGROUND

I have construed the facts and resolved all factual disputes in VanHook's favor. My task has been made more difficult by VanHook's seeming inability to recall innumerable material events. (See, e.g., VanHook Dep. at 11:4–14, 18:19–19:1, 22:7–15, 24:16–20, 26:17–21, 30:12–21, 37:19–38:3, 38:25–39:4, 41:2–5, 43:9–22, 44:1–7, 45:19–24, 46:9–17, 47:4–6, 54:9–13, 55:14–23, 57:20–58:10.)

VanHook, who is 44 years old, began working for Cooper in 2010 as a secretary. (Id. at 13:16–18, 16:13–17.) She was subsequently made a "Professional Services Representative," greeting patients, answering telephone calls, and logging appointments. (Ans., Doc. No. 6, ¶ 28; Def. SUMF ¶¶ 1, 3; Pl. Response to SUMF ¶¶ 1, 3.) She has a 22 year old son who recently served in the Coast Guard, and two nearly grown sons: Michael (17) and Sean (16), who reside with her. (VanHook Dep. at 9:1–15.)

Beginning in 2013, Cooper approved VanHook for "intermittent" FMLA leave to care for Michael, who (according to VanHook) has been diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder. (Id. ¶¶ 11, 20; Ex. 6 to Mot. for Summary Judgment.) According to VanHook, Michael is prone to aggressive outbursts and must be taken to medical

appointments. (Pl. SUMF ¶ 6.) VanHook testified that after Michael lacerated his wrist during an outburst, he required supervision "at all times of the day." (Id. ¶ 5; VanHook Dep. at 76:5–7; Ex. 6 to Mot. for Summary Judgment.)

In February 2016, supervisor Christine Mueller put VanHook, who was working as a PSR, on an "action plan for improvement," noting that VanHook was insensitive, discourteous, and argumentative in dealing with patients. (VanHook Dep. at 29:10–33:10.) It does not appear that VanHook challenged this action under Cooper's formal grievance process. In September 2016, VanHook had an altercation with a patient. (Id. at 37:1–18.) Although VanHook testified that the patient struck her, Cooper had VanHook "written up" because the patient had complained about her. (Id. at 37:1–18; Ex. EE to Opp'n) ("The patient apparently waived [sic] papers in [VanHook's] face and tapped [her] 3 times on the face with the papers."). Once again, VanHook did not grieve this action. Although VanHook testified that during this six month period in 2016, she had sent well over ten emails complaining that these disciplinary actions constituted "retaliation and harassment," she has produced no such evidence. (VanHook Dep. at 83:3–84:15.) Rather, she offered only a single email from May of 2017 in which she complained about various matters. (Ex. J to Opp'n.)

Although VanHook could remember few of the details, it also appears from her deposition testimony that as a result of the September 2016 face tapping incident, she "was diagnosed with an acute stress disorder." (VanHook Dep. at 36:20–25.) VanHook described herself as experiencing "depression, severe anxiety, panic attacks and related symptoms." She took medical leave from October 2016 through December 2016 after having a "nervous breakdown." (Pl. SUMF ¶¶ 10–11; Def. SUMF ¶ 27; Pl. Response to SUMF ¶ 27.)

Cooper asks every employee intending to take intermittent FMLA leave to inform Human Resources by voicemail on the "FMLA hotline." (Def. SUMF ¶ 12; Pl. Response to SUMF ¶ 12.) HR then informs the employee's manager. (Id. ¶ 13.) When VanHook called the hotline to report intermittent leave, Cooper sometimes requested supporting medical documentation, but never refused any of her many leave requests. (Id. ¶¶ 14, 18.)

After Mueller apparently criticized VanHook's inordinate FMLA leave, VanHook asked to be transferred to another location and department. (Id. ¶ 29.) Once transferred, VanHook fared no better with her new supervisor, Bonnie Mannino. According to VanHook, Mannino "frequently made negative comments regarding VanHook's having taken FMLA leave for herself and her disabled son." (Id. ¶¶ 30–32; Pl. SUMF ¶¶ 13–14.) VanHook hired a lawyer, and "began making complaints of discrimination and harassment against [Mannino]." (Pl. SUMF ¶ 14.) By July 2017—the same month that VanHook began working for Mannino—VanHook's lawyer contacted Cooper regarding Mannino's "harassing, negative and discriminatory comments." (Id.)

On December 27, 2017, Mannino admonished VanHook regarding her ten unscheduled days off between April and December 2017, and her "unprofessionalism" when communicating with another employee and a patient. (Def. SUMF ¶ 36; Pl. Response to SUMF ¶ 36; Ex. 9 to Def.'s Mot. for Summary Judgment; Ex. 10 to Def.'s Mot. for Summary Judgment.) Once again, VanHook signed the associated Disciplinary Action Forms but, again, did not file a grievance under Cooper's formal process. (Def. SUMF ¶¶ 36–37; Pl. Response to SUMF ¶¶ 36–37.)

That same day, Mannino emailed Theresa Sentel, Cooper's "Human Resources Business Partner," noting that VanHook had taken 500 hours of FMLA leave in the past calendar year, when Cooper allowed a maximum of only 480 hours. (Id. ¶ 40; Ex. 11 to Def.'s Mot. for Summary Judgment.) Mannino also testified that she had heard from a coworker that VanHook took the

FMLA leave for reasons other than her stated need to care for Michael.  (Def. SUMF ¶ 41; Pl. Response to SUMF ¶ 41.)  In early 2018, VanHook again complained that Mannino was harassing her regarding her purported abuse of FMLA leave.  (Pl. SUMF ¶ 14.)

On January 5, 2018, Cooper employees Sentel, Yvonne Richards, Jennifer Tracy, and Kristen Antonelli Spina exchanged emails regarding VanHook's FMLA leave.  Richards wrote to Sentel (copying the others) that VanHook took a full day of FMLA leave after she mistakenly locked the keys inside her car while trying to calm Michael during an outburst and had to wait for a tow truck.  (Ex. O to Opp'n.)  VanHook took issue with Spina's advice that the time she spent waiting for the tow truck was not allowed under FMLA.  (Id.)  Richards wrote: "This is very frustrating as this employee is constantly missing work and wants every minute out of work to count as FMLA to care for her child.  Can we discuss this further . . . . there has to be something we can do to stop this madness."  (Id.)  Tracy responded that "this was not the story, it seems to have changed a bit since last week."  (Ex. N to Opp'n.)  Sentel wrote, "I agree we need to meet to discuss this [and make a] plan of action."  (Ex. O to Opp'n.)

At this time, Cooper hired Digistream, a private investigation firm, to surveille VanHook.  (Def. SUMF ¶ 44; Pl. Response to SUMF ¶ 44.)  Investigators watched VanHook on February 12, February 19, and March 9, 2018—dates on which VanHook had taken FMLA leave to care for Michael.  (Def. SUMF ¶ 46; Pl. Response to SUMF ¶ 46.)  Their written reports for those days are confirmed by still photographs and exceedingly clear video footage.

On February 12, VanHook texted Mannino that she had to take FMLA leave because Michael was not having "a good day."  (Id. ¶ 47.)  The investigator watched VanHook that day between 12:30 p.m. and 4:00 p.m.  (See Ex. 13 to Def. Mot. for Summary Judgment.)  As he reported, at 12:30 p.m., VanHook drove from her house to Voorhees Middle School, where she

picked up Sean.  (Id.; Ex. BB to Opp'n.)  VanHook then stopped at a Dunkin Donuts drive-through window before returning home.  (Ex. 13 to Def. Mot. for Summary Judgment.)  At 1:45 p.m., VanHook drove alone to LA Fitness, where she remained until 3:20 p.m., when she went to a Walmart.  (Id.)  At 3:30 p.m., she left the Walmart and returned home.  (Id.)  Video and images appended to the report show VanHook waiting at the school, taking out trash, and exercising on a treadmill.  (Id.)

VanHook also took FMLA leave on February 19, ostensibly because Michael's school was closed for President's Day and she could not leave him alone at home.  (VanHook Dep. at 184:12–16.)  Yet, Michael's father (VanHook's former husband) was at her home that day.  Video and photographs show that at 8:00 that morning, VanHook and Michael drove to the Cooper location in Cherry Hill.  (Ex. 14 to Def. Mot. for Summary Judgment.)  A short time later, VanHook and Michael drove to a diner, where they ate breakfast.  (Id.)  The investigator then lost sight of VanHook.  (Id.)  At around 12:30 p.m., she and Michael returned home and unloaded items from the car with the help of Michael's father.  (Id.; VanHook Dep. at 185:6–16.)  At 1 p.m., VanHook and Sean drove to L.A. Fitness, briefly spoke with someone, and then drove to Target.  (Ex. 14 to Def. Mot. for Summary Judgment.)  After trying on and buying a pair of shoes, VanHook drove to a grocery store with Sean.  (Id.)  She drove home at 2 p.m.; the investigator ended surveillance an hour later.  (Id.)

On March 7, VanHook left a voicemail message stating that she needed eight hours of FMLA leave on March 9 to take Michael to doctors' appointments.  (Def. SUMF ¶ 50; Pl. Response to Def. SUMF ¶ 50; Ex. A to Def. Mot. for Summary Judgment.)  Yet, the Digistream video and photographic evidence as well as its investigative report confirmed that at 6:30 a.m. on March 9, Michael left VanHook's home alone and boarded a school bus.  (Ex. 14 to Def. Mot. for

Summary Judgment; Ex. BB to Opp'n.) At 8:30 a.m., VanHook and Sean drove to a medical appointment, and then returned home. (Ex. 14 to Def. Mot. for Summary Judgment.) At 1 p.m., VanHook and Sean went to Wawa, stopped at Eastern Regional High School, visited a Ross store, and then drove away, losing the investigator, who was unable to locate VanHook again that day. (Id.)

On March 21, 2018, Sentel and Tracy met with VanHook to ask her about her use of FMLA time on February 12 and 19, and March 9. (Def. SUMF ¶ 52; Pl. Response to SUMF ¶ 52.) VanHook testified that she could not retrieve her planner, which might have helped her recall her activities on particular days. (VanHook Dep. at 186:17–187:20.) Tracy testified that VanHook refused to view the surveillance footage or explain her actions on those days. (Tracy Dep. at 58:15–60:1.) Cooper fired VanHook later that day for "inappropriate use of FMLA time." (Ans., Doc. No. 6, ¶ 28; Pl. SUMF ¶ 16; Compl., Doc. No. 1, ¶ 57.)

On July 10, 2019, VanHook filed the instant Complaint against Cooper, alleging discrimination, retaliation, and harassment in violation of the ADA and New Jersey's Law Against Discrimination, and retaliation in violation of the FMLA. (Doc. No. 1.)

Cooper moves for summary judgment, arguing: (1) VanHook cannot show Cooper's stated reason for her termination was pretextual, and (2) VanHook has failed sufficiently to show or even allege that she is disabled or that Cooper discriminated against her. (Doc. No. 27.) The matter has been fully briefed. (Doc. Nos. 27–31, 33, 35.)

## IV. STANDARDS

### A. Discrimination

Under the McDonnell Douglas burden-shifting framework:

a plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must articulate a legitimate, non-discriminatory reason for

the adverse employment action. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.

Ross v. Gilhuly, 755 F.3d 185, 191 (3d Cir. 2014) (internal citations omitted) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  This framework applies to VanHook's ADA and LAD discrimination claims and FMLA, ADA, and LAD retaliation claims.  See, e.g., Ross, 755 F.3d at 193 (McDonell Douglas applies to FMLA retaliation); Oden v. SEPTA, 137 F. Supp. 3d 778, 790 (E.D. Pa. 2015) (ADA retaliation); Dunkley v. S. Coraluzzo Petrol. Transporters, 98 A.3d 1202, 1207–08 (N.J. Sup. Ct. App. Div. 2014) (LAD retaliation); Proudfoot v. Arnold Logistics, LLC, 59 F. Supp. 3d 697 (M.D. Pa. 2014) (ADA discriminatory discharge); Melick v. Twp. of Oxford, 683 A.2d 584, 588–89 (N.J. Super. Ct. App. Div. 1996) (LAD discriminatory discharge).

To the extent VanHook's harassment contentions are premised on a hostile work environment, the McDonnell Douglas framework does not apply, because "there can be no legitimate justification for a hostile work environment." Moody v. Atlantic City Bd. of Educ., 870 F.3d 206, 213 n.11.

Each discrimination theory has its own prima facie standard.

B. Prima Facie Retaliation Claims

1. *Family Medical Leave Act*

An eligible employee is entitled under the FMLA to 12 workweeks of leave every 12 months either because of her own serious health condition or to care for a child with a serious health condition.  29 U.S.C. § 2612(a)(1); Ross, 755 F.3d at 191.  "To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related

to her invocation of rights." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301–02 (3d Cir. 2012).

*2. Americans with Disabilities Act*

Under the ADA, "to prevail under a 'pretext' theory of illegal retaliation 'a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).

*3. Law Against Discrimination*

In New Jersey, "the prima facie elements of a retaliation claim under the LAD require[] plaintiff to demonstrate that: (1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." Victor v. State, 4 A.3d 126, 408–09 (N.J. 2010); N.J. STAT. ANN. § 10:5–1 *et seq.* Although the New Jersey and ADA discrimination standards seem similar—and New Jersey "has frequently resorted to federal law to interpret the LAD as it follows in certain instances federal substantive and procedural standards"—"the LAD is more expansive and offers more protection in certain instances." Boyce v. Lucent Technologies, 2007 WL 1774267, at *5 (N.J. Super. Ct App. Div. 2007).

C. <u>Prima Facie Discriminatory Discharge Claims</u>

*1. Americans with Disabilities Act*

"[F]or a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'" <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999).

*2. Law Against Discrimination*

"In discriminatory discharge cases brought under the LAD based on an employee's handicapped status, the employee must carry the initial burden of establishing a prima facie case of discrimination, [which] requires proof that the employee was handicapped, that she was performing at a level that met the employer's expectations, that the employee was fired, and that the employer then sought someone to perform the same work." <u>Svarnas v. AT&T Commc'ns</u>, 740 A.2d 662, 670 (N.J. App. Div. 1999); N.J. STAT. ANN. § 10:5–1 *et seq*.

**V.   DISCUSSION**

No matter how favorably construed, the record does not support VanHook's multitude of claims. Although Cooper staff commented on different incidents, all believed that VanHook was abusing her FMLA leave. This led to Cooper hiring Digistream, which uncovered evidence of undoubted abuse, causing VanHook's termination. As a matter of law, none of this amounted to discrimination, retaliation, or harassment.

A. <u>Discrimination and Retaliation</u>

Cooper apparently concedes without discussion that VanHook has made a prima facie showing of FMLA retaliation as well as ADA and LAD discrimination and retaliation relating to

VanHook taking leave to care for her son. Although it is far from clear that VanHook has actually made these showings, because the Parties do not address the question, I will move to Cooper's primary argument: that VanHook cannot show Cooper's stated reason for her termination was pretextual. (Doc. No. 27 (citing Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006).)

Cooper maintains that it fired VanHook because she misused FMLA time, as proven by Digistream's findings, videos, and photographs. (Id. at 13–22; Def. SUMF ¶ 57.) VanHook's response is confused and confusing. She does not dispute the accuracy or authenticity of the Digistream evidence. Rather, referring to comments made by Cooper staff, she argues that Cooper's hiring of Digistream "was initiated without any reasonable suspicion of abuse and was therefore discriminatory," and that Digistream's reports do not support Cooper's decision to fire her. (Opp'n, Doc. No. 33, at 2, 14.) I do not agree.

Because the decision to hire Digistream was lawful, VanHook's objection is beside the point. Cf. Parker v. Verizon Pa., Inc., 309 Fed. App'x 551, 557–58 (3d Cir. 2009) (non-precedential) ("Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave."); Callison v. City of Phila., 430 F.3d 117, 121 (3d Cir. 2005) (same); Stronum v. U.S. Airways, Inc., 83 F. Supp. 2d 894, 901 (S.D. Ohio) ("[T]he Defendant must articulate 'particularized facts' to support its *termination* decision, not its decision to conduct surveillance." (emphasis in original)). In any event, as I have discussed, Cooper had reasonable grounds to investigate VanHook, who continually took leaves. As I have discussed, Cooper staff certainly suspected misuse before Cooper hired Digistream. (See January 2, 2018 Email from Yvonne Richards to Theresa Sentel, Ex. L to Opp'n ("She has an intermittent FMLA, this has been a long standing issue and she is moved from dept to dept due to how much she uses

FMLA. She is always trying to work the system."); Ayo Dep. at 29:6–30:13 ("[Mueller, VanHook's supervisor until July 2017] had concerns that Ms. Vanhook was not using [FMLA time] appropriately. . . .The main [concern] I remember was requesting FMLA time the day after Thanksgiving for an appointment, and Ms. Vanhook had asked for the entire eight hours.")).

VanHook's firing was not based on staff suspicious, however. Cooper took no adverse employment action until it had irrefutable evidence of VanHook's wrongdoing. Again, there is nothing improper here.

VanHook's argument that Digistream's reports—the substance of which she either distorts or ignores—do not make out abuse is incorrect and, again, beside the point. The videos and photos show that on three days she took FMLA leave so that she could care for Michael, VanHook was shopping, exercising, ferrying Sean, purchasing Dunkin Donuts, and the like. On February 19, for example, she took Sean to LA Fitness and then tried on and purchased a pair of shoes. Remarkably, on March 9—for which she was allowed eight hours of leave so that she could take Michael to a doctor's appointment—she took *Sean* to a doctor's appointment after Michael boarded a school bus at 6:30 a.m. "The FMLA . . . does not prohibit the termination of an employee who abuses her leave . . . ." Wawars v. City of Plainfield, 489 Fed. App'x 585, 588 (3d Cir. 2012); see also Hughes v. City of Bethlehem, 294 Fed. App'x 701, 704 (3d Cir 2008) (dishonesty is a legitimate and nondiscriminatory reason for termination); Sledge v. Comcast ABB Mgmt., LLC, 2012 WL 2368319, at *4 (N.D. Ill. June 20, 2012) ("[P]laintiff's FMLA leave allowed her to use it only for caring for her daughter, not for recovering from caring for her daughter, or for conducting personal business after caring for her daughter."); Boecken v. Gallo Glass Co., 2008 WL 4470759, at *11 (E.D. Cal. 2008) (employee who took FMLA leave to care for his grandmother was not entitled to take a walk in the park), rev'd in part on other grounds, 412 Fed. App'x 985 (9th Cir 2011) (non-

precedential) ("Because [plaintiff] was walking in the park and not in close and continuing proximity to his grandmother, he was misusing his leave under the Family Medical Leave Act[.]").

When VanHook seeks to explain away Digistream's damning evidence, she only underscores its cogency. VanHook argues that she:

> testified [at deposition] that during the surveillance dates in question, when she was away from her son for short periods of time, it could have been because her son was having an in-home therapy session, or in-home schooling with a teacher . . . .

(Opp'n, Doc. No. 33, at 19.) Such speculation is inevitable because VanHook said she could not remember what she actually did on the days she was watched, nor could she refer to her yearly (2018) "planner." (VanHook Dep. at 191:11–192:22.) At deposition, she offered the following testimony:

> [Counsel] Q. And have you had the opportunity to check your planner in connection with the dates of the surveillance of this case?
> [VanHook] A. I have not.
> Q. [. . .] Do you still have it?
> A. I don't recall. I could look for it. But I doubt highly I have it, but I could look for it.
> Q. [. . .] Would you have thrown [the 2017, 2018 planners] away [. . .] ?
> A. Yes.

(Id.) Significantly, VanHook produced no evidence of "an in-home therapy session," or "in-home schooling with a teacher," such as invoices, checks, or affidavits from the therapist or teacher involved. Nor do the Digistream videos and photographs of VanHook's home show the arrival or departure of any teacher or therapist.

It is thus painfully obvious that VanHook cannot impugn the Digistream evidence, which amply supports her termination. VanHook's guesses about what she might have been doing on February 12, February 19, and March 9 cannot defeat summary judgment. See Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat a motion for summary judgment."); Grove v. Admiral Peary Area Vocational-Tech.

Sch., 221 F. App'x 101, 104 (3d Cir. 2007) (the plaintiff's "self-serving speculation about the reasons for his demotion" insufficient at summary judgment stage); Wehrle v. Phillips, 2010 WL 906096, at *2 (D.N.J. Mar. 9, 2010) (granting summary judgment where the "[p]laintiff's conclusion that Defendant's proffered reason is really a pretext for discrimination continue[d] to rest upon speculation only.").

Moreover, Cooper is not required to show that VanHook actually abused her leave. The Digistream evidence certainly provided Cooper with a good faith reason to fire VanHook:

> To discredit the employer's proffered reason [for firing the employee] . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994); Capps v. Mondelez Glob., LLC, 847 F.3d 144, 152–53 (3d Cir. 2017) (internal citations and emphasis omitted) ("FMLA retaliation claims require proof of the employer's retaliatory intent. . . . Where an employer provides evidence that the reason for the adverse employment action taken by the employer was an honest belief that the employee was misusing FMLA leave, that is a legitimate, nondiscriminatory justification for the discharge.").

VanHook responds that Cooper either did not or should not have relied on the Digistream findings and thus must have fired her because of discriminatory animus. Crewl v. Port Auth. of Allegheny Cnty., 837 F. Supp. 2d 495, 507 (W.D. Pa. 2011) ("If the stated rationale to justify an employment decision is so implausible that a fact finder could not believe it to be worthy of credence, a plaintiff has established pretext."). The record shows the opposite. According to VanHook, Cooper could not have relied on the February 12 and February 19 surveillance reports in deciding to fire her because it had previously approved her FMLA leave for those days. She

thus again complains that Cooper chose to investigate and gather evidence of VanHook's dishonesty before taking any disciplinary action on March 21. The argument refutes itself.

VanHook also distorts testimony from Richards (who acknowledged that she was not involved in the decision to fire VanHook) and Tracy (whose damaging testimony VanHook simply discredits) to bolster her otherwise baseless allegation that Digistream's February 12 and 19 reports did not figure in her dismissal. (Opp'n, Doc. No. 33, at 19, 24; Richards Dep. at 23:7–15, 24:4–19; Tracy Dep. at 15:16–19, 28:14–20.)

VanHook similarly argues a schedule change of the day HR sought to meet with her suggests that Cooper did not rely on the March 9 report in firing her. (Opp'n, Doc. No. 33, at 20–21; VanHook Dep. at 188:10–13; Mannino Dep. at 29:9–22.) Once again, this change had nothing to do with Cooper's obvious reliance on the Digistream evidence.

Finally, VanHook argues that because Mannino and others were not certain that VanHook was abusing FMLA leave, Cooper's stated basis for her termination was pretextual. (Opp'n, Doc. No. 33, at 11–14.) The contention makes no sense. Once again, Cooper hired Digistream because it suspected abuse but would take no disciplinary action until it was certain. Digistream's reports, photos, and videos for February 12, 19, and March 9 provided such certainty. In these circumstances, Cooper had a good faith, permissible reason to hire Digistream. Cooper did not invent evidence of VanHook's fraud.

In sum, VanHook has not shown pretext. Her ADA, FMLA, and LAD retaliation claims and ADA and LAD discriminatory discharge claims thus fail. McDonnell Douglas, 411 U.S. at 804. I need not address Cooper's remaining argument that the person who decided to fire VanHook could not have acted with a discriminatory motive.

B. Harassment

VanHook alleges that Cooper violated the ADA and LAD by "harassing Ms. VanHook because of her disabilities and/or because Cooper perceived her to be disabled," and by "harassing . . . Ms. VanHook because of her association with a disabled individual." (Compl., Doc. No. 1, ¶¶ 71–83.) Cooper argues that VanHook's allegations fail because she has neither proven that she has a disability nor demonstrated that Cooper took any discriminatory actions on the basis of that disability. (Mot. for Summary Judgment, Doc. No. 27, at 28–29.)

The Third Circuit has held that:

> [a] claim for harassment based on disability . . . would require a showing that: (1) [plaintiff] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [defendant] knew or should have known of the harassment and failed to take prompt effective remedial action.

Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999).

Similarly, in New Jersey, "to sustain a claim of hostile work environment based on disability . . . a plaintiff must establish that the conduct complained of would not have occurred but for his or her handicap, and that it was severe and pervasive enough to make a reasonable person in the employee's shoes believe that the conditions of employment had been altered and the working environment had become hostile and abusive." Leonard v. Metro. Life Ins. Co., 723 A.2d 1007, 1011 (N.J. Super. Ct. App. Div. 1999); see also Victor, 4 A.3d at 141.

Under state and federal law, a person merely regarded as disabled is also protected from discrimination. Dennis v. Atlantic Cnty., 863 F. Supp. 2d 372, 378 (D.N.J. 2012); Wilson v. MVM, Inc., 475 F.3d 166, 179 (3d Cir. 2007). VanHook thus correctly argues that she need not demonstrate that she was actually disabled, but only that Cooper perceived her to be so. Although,

as I have discussed, the record suggests that VanHook's claimed disabilities (and those of Michael) might have been fabricated, the record includes sufficient evidence, when viewed most favorably to VanHook, to find that Cooper believed she had a disability.  (See Ayo Dep. at 43:3–10 ("Q: Does this refresh your recollection that you were aware that Ms. VanHook suffered from panic attacks? A: As of 5/31/17, I was definitely aware"); Tracy Dep. at 31:10–21; October 26, 2016 Email from Yvonne Richards to Christine Mueller, Ex. DD to Opp'n ("The time she does not have FMLA is being approved as an accommodation of leave under the ADAAA [sic]."); EEOC Position Statement, Ex. BB to Opp'n ("[H]er only period of leave or accommodation for her own condition was a period of leave in 2016 and a doctor's note to take 2 days off and take short breaks for panic attacks in May 2017 . . . . She has not sought an accommodation for her own disability at *any other time*." (emphasis added)); Cooper University Hospital Accommodation Request: Medical Inquiry Form, Ex. CC to Opp'n.).  Accordingly, I reject Cooper's argument that it is entitled to summary judgment because VanHook failed to demonstrate she was disabled or perceived as disabled.

I agree with Cooper, however, that VanHook has not shown that Cooper harassed her because of her disability, perceived disability, association with Michael, or use of FMLA leave. Although her Complaint includes repeated allegations that her supervisors made harassing comments, there are no examples.  (Compl., Doc. No. 1, ¶¶ 1, 31, 47–54, 67, 73, 79.)  In opposing summary judgment, VanHook makes the circular argument that her Complaint includes examples of the discriminatory comments.  (Doc. No. 33 (citing to Compl., Doc. No. 1, ¶¶ 32, 49, 52, 54–55, 60–62.))  Similarly, although VanHook testified that she described the "bullying and harassment" in the many emails she sent, she introduced no such email evidence.  (Id. at 240:2–241:23.)  In thus offering nothing to support her harassment allegations, VanHook cannot defeat

summary judgment.  See Podobnik v. U.S. Postal Serv., 409 F.3d 584, 495 (3d Cir. 2005) (quoting

Celotex, 488 U.S. at 325) ("To survive summary judgment, a party must present more than just

'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue.");

see also Canada v. Samuel Grossi & Sons, Inc., 476 F. Supp. 3d 42, 60 (E.D. Pa. 2020) (no hostile

work environment found where the plaintiff made conclusory claims that he was "harassed" every

time he returned from FMLA leave).

I have nonetheless reviewed VanHook's deposition to see if it includes any support for her

hostile work environment allegations.  It does not.  For instance, VanHook testified that she was

told that if she left work (because she said she was having a panic attack) before someone arrived

to cover her shift, she would be fired, making her feel "almost like they were pushing me out of

my position."  (Id. at 233:16–14, 239:7–14.)  At some point, she was assigned to work in the

"telephone room" for three weeks, which she believes was punishment for her complaints

regarding her treatment at Cooper—although she acknowledged that working in the telephone

room was a regular part of her job.  (Id. at 21:11–18, 116:15–117:11.)

VanHook also described "taunting" comments from other employees such as "oh, there it

goes again, Marsha and her accusations that she's having a panic attack," and her manager stating

"some people are always sick or some people have excuses."  (Id. at 234:18–236:24.)  VanHook

similarly objected to actions taken by her supervisor:

> [Mueller] knew that I was on FMLA.  And she discussed me being on FMLA with
> several employees.  When I would call out . . . it caused the other employees to
> have a resentment towards me to, you know, talk behind my back.  Every time I
> walked in, there was whispering or pointing at me and, oh, yeah, look who's back
> from FMLA.  Are you going to leave in another five minutes. . . . So just little
> comments, little remarks, the animosity, the pointing, the whispering . . . .

(Id. at 101:3–22.)

Finally, VanHook's subsequent supervisor, Mannino, also made "negative comments like, oh, another FMLA day or, oh, you're going to be out again," and informed other employees when VanHook was on FMLA leave. (Id. at 163:8–168:7.) VanHook complained that Mannino texted her while she was on FMLA leave asking whether VanHook intended to use particular upcoming days for leave (because other employees had requested those days off). In VanHook's view, "you're not supposed to text me or bother me when I'm out on leave." (Id. at 168:16–23.)

Taken together, these "little comments" and related incidents do not make out a hostile work environment. As the Eighth Circuit has observed, "the ADA, like Title VII, is not in effect a 'general civility code." Cannice v. Nw. Bank Iowa N.A., 189 F.3d 723, 726 (8th Cir. 1999). The Third Circuit has advised that remarks criticizing absenteeism do not support an ADA harassment claim: "we have rejected a theory of harassment so broad as to dictate that any time a supervisor harasses an employee for absences the employee claims are due to a disability, that harassment is based on the employee's disability under the ADA." Barclay v. Amtrak, 240 F. App'x 505, 509 (3d Cir. 2007); see also Torres v. Cnty. Of Berks, 2018 U.S. Dist. LEXIS 12823, at *32–36 (E.D. Pa. 2018) (no hostile work environment where the plaintiff's coworkers made comments such as "oh, you're here today," "oh, you showed up today," "wow, you actually work here," and "I wish I had a doctor that would put me out of work for one month."). The remaining comments, although perhaps insensitive, are not so severe and pervasive as to violate the ADA. See Stoppi v. Wal-Mart Transp., LLC, 2010 WL 3398990, at *10 (M.D. Pa. Aug. 26, 2010) (comments regarding the plaintiff having a "bipolar moment" did not create hostile environment); Walton, 168 F.3d at 667 (no hostile work environment where supervisor told the plaintiff she was "manic-depressive" and asked her daily while she was hospitalized when she would return to work); Wright v. Providence Care Ctr., LLC, 822 F. App'x 85, 97 (3d Cir. 2020) (rejecting hostile

work environment claims where the plaintiff alleged "daily and weekly" harassment but cited only a handful of incidents).

A review of cases in which disability-related hostile work environment claims survived summary judgment underscores that VanHook did not suffer "severe and pervasive" harassment. See, e.g., Mangel v. Graham Packaging Co., L.P., 2016 WL 1266257, at *5–6 (W.D. Pa. 2016) (coworkers and a supervisor "daily" called the plaintiff, who wore leg braces and walked with a limp, names such as "Forrest Gump," "cripple," "Gumby," "crippled ninja," and "ratchet ass"); Motto v. City of Union City, 1997 WL 816509, at *11 (D.N.J. 1997) (the plaintiff's supervisor routinely called him "Shamu" and "Goodyear Blimp" and where the plaintiff was continuously given tasks not commensurate with his qualifications); Miller v. Cohen, 52 F. Supp. 2d 389, 402 (M.D. Pa. 1998), aff'd, 185 F.3d 862 (3d Cir. 1999) (the plaintiff was required to lift 39 to 60 pound boxes despite doctor's limitation that she lift no more than 10 pounds and was denied "flex-time" allowed to other employees for health problems; supervisor asked employees to report the plaintiff's personal calls, and listened at the door while the plaintiff made a personal call in the women's room and installed an overhead mirror to monitor the plaintiff).

Similarly, VanHook offers no authority suggesting that an employer creates a hostile environment by requiring a panicky employee seeking immediate leave to wait for another employee to cover her shift. Nor do the "write-ups" about VanHook's poor performance—which she never challenged—constitute harassment. Compare Quick v. GEO Grp., Inc., 2020 WL 532343, at *12 (W.D. Pa. 2020) (hostility shown by supervisor who disciplined the plaintiff for failure to perform tasks he could not reasonably preform with his disability), with Vendetta v. Bell Atl. Corp., 1998 WL 575111, at *9–10 (E.D. Pa. 1998) (no hostility shown by "write-ups" placed in the plaintiff's files, which were neither false nor unjustified). Finally, that VanHook's

supervisor sent her text messages while she was on leave was not hostile.  See Callison, 430 F.3d

at 121 (internal citation omitted) ("[T]here is no right in the FMLA to be 'left alone.'").

VanHook fares no better under New Jersey law, which is substantially the same.  See

Heitzman v. Monmouth Cnty., 728 A.2d 297, 302–03 (N.J. Super. Ct. App. Div. 1999) ("'[S]imple

teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the 'terms and conditions of employment.'"), overruled on other

grounds by Cutler v. Dorn, 955 A.2d 917 (N.J. 2008); Incorvati v. Best Buy Co., 2010 U.S. Dist.

LEXIS 122038, at *32–33 (D.N.J. 2010) (the plaintiff's allegations that supervisor "ridiculed him

on numerous occasions" "due to his age and because he had suffered a heart attack" insufficient

to make out hostile work environment); Hopkins v. Kuehne + Nagel Inc., 2018 U.S. Dist. LEXIS

201918, at *25–28 (D.N.J. 2018) (no hostile work environment where supervisor made

"underhanded" comments about the plaintiff's need for time off); Velcko v. Saker Shoprites, Inc.,

2016 U.S. Dist. LEXIS 122169, at *16–17 (D.N.J. 2016) (work environment not hostile where the

plaintiff was allegedly "ridiculed because of his health condition," coworkers bet on when he

would return to work, a supervisor commented that plaintiff was "always . . . sick" and "asked how

long would he  be out this time," and a different supervisor "repeatedly called him 'Family Leave

Larry' in front [of] other employees"); Lehmann v. Toys R Us., Inc., 626 A.2d 445 (N.J. 1993);

Tynan v. Vicinage 13 of Super. Ct., 798 A.2d 648, 659 (N.J. Super. Ct. App. Div. 2002).

Once again, the state cases in which disability-based hostile work environment claims

survived summary judgment underscore that VanHook was not harassed.  See Leonard, 723 A.2d

at 1009 (diabetic plaintiff's supervisor repeatedly maligned the plaintiff's need to eat lunch

because of low blood sugar, and made disparaging comments such as, "I don't give a f--- about

you being diabetic and having low blood sugar," "f--- [you] being diabetic and having to stop for lunch," and "get your diabetic ass out of here before you die in my office" (alterations in original)).

## VI.     CONCLUSION

In sum, the record shows that Marsha VanHook was a less than stellar employee who spent as much time away from work as possible, and repeatedly lied to her employer when she said she needed to take FMLA leave to care for her disabled son.  The supporting "evidence" VanHook presents—primarily her own testimony—serves only to confirm that her firing was permissible. The Family Medical Leave Act allows employees time from work so that they can address serious health-related problems, not so that they can take up life's more mundane tasks.  I will thus grant Cooper's Motion for Summary Judgment.

An appropriate Judgment follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

_____

May 28, 2021                                    **Paul S. Diamond, J.**